Good morning, Your Honors. My name is Roy Cattrall. I'm here on behalf of plaintiff appellants Kathleen Conroy and Sheila Crowley, and at this point I'd like to reserve five minutes of my time for rebuttal. We believe, Your Honors, that the district court committed reversible error in granting summary judgment to defendants 3M and Staples on all of the consumer plaintiffs' antitrust counts. The district court acknowledged that 3M had already been found in the LePage's antitrust trial liable for unlawful monopolization of the relevant market for clear and transparent tape for home and office use, and that it had been found so liable by engaging in unlawful exclusive dealing arrangements and bundled rebates. Nevertheless, hearkening to the Illinois BRIC doctrine, the district court reasoned that we as consumer plaintiffs could not recover for any antitrust violations unless we first prove that Defendant 3M and Defendant Staples, as the representative of a retailer class, engage in a price-fixing conspiracy. But is a conspiracy limited to price-fixing to the exclusion of all other types of exclusionary conduct? We believe that was error, and before I proceed to show why that is, I'd like to outline the five points of error, some of which collapse onto one another, that the district court committed. By the way, had the district court not committed that initial error, then we would have been entitled, arguably, to proceed against 3M directly. They, after all, have been found liable for monopolization, unlawful monopolization. And the only thing that prevented us from proceeding against them directly to recover the anticompetitive for the anticompetitive price that we paid was the imposition of the Illinois BRIC bar by the district court. The district court found that our evidence did not prove a price-fixing conspiracy and therefore dismissed all counts. The first point of error was the district court's invocation and decision to apply Illinois BRIC to this case, even though it is undisputed that there was no overcharge, much less an overcharge that was passed on to us as consumers. And plainly, Illinois BRIC only deals with that factual scenario, where there is no overcharge, there is no danger of duplicative recovery, nor a complication of allocation or apportioning of damages between the direct and indirect purchasers. Second, once the district court decided to apply the Illinois BRIC doctrine to this case, erroneously, then it compounded that error we maintained. Let me go back to that for just a second. Let me see if I understand. So your contention, though, is that the consumer, the consumer who buys the tape, is paying a higher price. Well, it is, but to refine it more precisely, Your Honor, ultimately it pays a higher price. Well, it pays a higher price, but why? Because the lower-priced alternative, the generic private label tape, is now unavailable, right? LePage's, the generic private label tape manufacturer, was excluded for the market. That was what was found in the Third Circuit case. Now, that means that our injury as consumers accrues once we are forced to purchase only the higher, more expensive tape. For instance, if somehow the oil manufacturers conspired with their retail gasoline service station managers to only stock premium gasoline, removing unleaded regular gasoline, your injury accrues at the moment that happens, because now that lower-priced alternative is no longer available to you. And that's what we maintain happened here. One measure of our damages is that the day before the conspiracy to monopolize happened, we had at our disposal as consumers the ability to buy LePage's tape for a fraction of what the price was that was being charged by that man. Well, at least with the evidence with respect to Staples, that one retailer, there were other lower-priced alternatives available. Your Honor, the evidence with respect to Staples was that they, at some point of time I only mention that now just in connection with this price. And I'll get back to it, but to give you a sort of shorthand answer to that, the evidence with respect to what LePage's ended up stocking was a private label tape called Stockland. And the reason that that's not significant here is because it's not part of the relevant market definition. And the reason why it's not is because the Stockland tape, foreign-manufactured tape, is a matte-finished tape. It's not transparent. The LePage's jury found by its verdict on a special interrogatory that the relevant market only consisted of transparent tape. Now, the fact that they stock matte tape is of no consequence to us as consumers because we don't view that as substitutable. And that's not just some sort of conclusory assertion. The jury found that. They also stocked paperclips and Staples, real Staples, ways to affix, other ways to affix documents. But if we don't view that as a substitutable product, then it's of little consequence to us that those are less expensive than the brand-scotch tape. Our injury accrued when the true substitutable product, the generic version, was no longer available, and it was no longer available as a result of three infractions. As a result of the monopolization. Exactly. Of attempt to exclude LePage from the market. Attempting to and actually achieving it, because they were found liable for actual monopolization, not just merely attempted. Can I just ask you a question? Is it the court still has not received the Supreme Court a response from the government, and therefore has not had the conference yet? That's my understanding. I checked the Supreme Court docket yesterday. My understanding, and perhaps 3M's counsel will be able to elaborate on that, was that it's been several months. And they didn't give the government a date? They just said, we'd like to know your position, if you ever feel like telling us? That's, putting it charitably, that's how I understand it. But so far as I know, no solicitor general brief has been submitted, and no decision on certiorari has been granted. And I think it's getting a little bit late in the Supreme Court term to see those briefs, but I think that's where we stand, unless the docket that I checked is  No, that's what, that's what I understood also, but I thought maybe there was some sensible answer to this, but. Now, the second point, which I think ties into what Judge Pys was asking me about. The second point of error was this notion that the only conspiracy that would suffice for us to get over Illinois Brick was a price-fixing conspiracy. But I think, as my answer just illustrated, the reason we believe that was wrong is that a conspiracy to exclude a lower-priced competitor would suffice irrespective of any price-fixing. And you found as much just four months ago in the case that we cited in a Rule 20AJ paper, it's the Glenn Hawley case. It's the Glenn Hawley Entertainment v. Tektronix. There you agreed, and to quote your language directly, you said, if the antitrust laws are designed to protect customers from the harm of unlawfully elevated prices and from agreements from, between competitors at the same level of the market structure to allocate territories in order to minimize competition. Here's the language of interest. It is no stretch to conclude that these same laws protect customers from harm directly related to the unlawful removal of a competitive product from the market. And, by the way, that is also analogous to the Supreme Court's case on the exception to Illinois Brick. The leading case on that we cited was McCready v. Blue Shield of Virginia. That wasn't a price-fixing conspiracy. There the allegation was that the insurance carrier, Blue Shield, had conspired with the psychiatrist to exclude the psychologist from obtaining reimbursement and being covered by the insurance carrier. The consumer, much like us, sued, claiming that she was therefore denied reasonable access to a competitive provider, namely a psychologist, and that to do so she had to pay more. There was no price-fixing allegation, and the Supreme Court did not hesitate in holding that, nevertheless, Illinois Brick was not a bar. As a corollary to these two points of the misapplication of the Illinois Brick doctrine, the third point of error that the district court committed was that once it ruled that Illinois Brick applied and that we could only allege a price-fixing conspiracy, it also held that we had to join the retailers as co-conspirators, which is how Staples came into the picture. It's held that absent joinder, we could not invoke that Illinois Brick bar exception. The problem with that holding is that first it conflicts with the prior decisions of this Court, namely Shamrock v. Arizona, which, by the way, was decided with a panel consisting of now Supreme Court Justice Kennedy. And the suggestion that in addressing the Illinois Brick bar exception, Shamrock simply forgot to address the question of joinder is simply not credible. The whole point of that opinion was whether the Illinois Brick co-conspirator exception applied. And to suggest that a key element of that was joinder, but that this Court simply chose not to address that simply doesn't pass the laugh test. You also, a few years earlier, reiterated that joinder was not necessary in the Inglis case, which we cited in our briefs. But the point here is not simply to look at precedent and to see if we can excerpt one sentence from here and one sentence from there as to whether joinder is required. The rationale behind joinder has to be looked at. And the rationale behind joinder is that joinder should be required when failure to join the middleman could lead to duplicative recovery and thereby lead to the dangers of Illinois Brick. That's simply not at issue here, because 3M concedes, and we maintain, that the retailers were never overcharged. They were given a discount, a rebate. Now, so there are only three types of scenarios here that could happen. A retailer could have conspired with 3M, met its quota, and obtained a rebate. Whether they're joined or not, they have no claim. They obtained a discount. There was no overcharge. A retailer could have joined the conspiracy, failed to meet its quota, and not received a rebate. They're still not overcharged. They're paying the same price for 3M tape that they paid before. They just are not getting a discount. But failure to obtain a kickback rebate is never an overcharge, particularly when the rebate is alleged to be unlawful in the first place. And the third is someone, a retailer who comes in and says, I had nothing to do with this. 3M never approached me or I never joined. I just continued buying from LePage's and from 3M. They're never overcharged. And what's more, they were never prohibited from buying from LePage's. So there is no point to joinder here. And again, if we didn't have to join, if we didn't have to join, but for that erroneous decision, Staples wouldn't even be in this case, and our evidence would not have had to be pigeonholed into evidence only limited to Staples and 3M's dealings. After all, we're dealing with an antitrust violation which requires market exclusion as a whole. And to determine whether there's been monopolization and a conspiracy to monopolize and a conspiracy to exclude and a conspiracy to fix prices, we ought to be looking at what's happening in the market as a whole, not merely as to what's happening between 3M and one retailer. And the LePage's en banc decision cataloged that enormously and in great detail. And what's more, because I think I'm going to be hearing about this in 3M's opposition, let's disabuse this record of the notion put by 3M that LePage's was still available in any number of stores. Quoting now from ER 1237, which is the en banc opinion at page 31, although 3M claims that customers participating in its rebate programs continue to purchase tape from LePage's, the evidence does not support this contention. Many distributors dropped LePage's entirely. And of course, for antitrust purposes, the key inquiry is not whether some roll of LePage's tape was available at certain retailers at some place in undefined quantities. The question is whether LePage's was diminished from the marketplace to such a capacity so that it no longer posed any price-constraining competition. The fourth point, which I'll just summarize, is that irrespective of how you rule on Illinois brick, and we contend that it ought to be reversed on that ground, it was the case should still be reversed because we have a claim for injunctive relief. In other words, if we can prevail in showing that these rebates were unlawful, then we have grounds as consumers to ask the Court at the end of the trial to impose an injunction to prohibit 3M from continuing to engage in that conduct. And it's black-letter law that Illinois brick simply has no application to injunctive claims under the antitrust law. A similar corollary is that we have a claim under the Cartwright Act. And the Cartwright Act, by the terms of that statute, under Section 16750a, says that indirect purchasers are allowed to sue as well as direct purchasers. In other words, California State law does not follow Illinois brick. The district court dismissed our Cartwright Act claim because it said we couldn't represent a national class. Fair enough. That's a rule – that's a basis perhaps to deny our motion for class certification or to constrain our class definition down the road. But it's not a basis to enter summary judgment, particularly whereas here, summary judgment was argued before class certification. The fact of the matter is that Kathleen Conroy, one of the plaintiffs, is a California resident. She bought her 3M roll of tape in California, and she bought 3M tape. That qualifies her as a consumer purchaser withstanding to represent a class in California under the Cartwright Act. The scope of that class is to be decided on a Rule 23 motion. But you agree that Staples should be dismissed from the Cartwright Act, right? Staples should be dismissed from the – well, we don't believe Staples should be in this case as a named defendant to begin with. Well, they are, and the Court dismissed them because they dismissed the Cartwright claim. But you're not opposing the dismissal of Staples from the Cartwright Act. I am not, and the reason for that is that it is true that our – we have two plaintiffs, a Virginia and a California one. The California claim cannot be dismissed. I understand the reason. Yes. All right. Counsel? Yes. Illinois BRIC is aptly named because it's a BRIC case, and the BRIC cases are pragmatic. Now, let's assume that you have your class certified, and let's assume that you win a judgment of $300 million. Tell me how you're going to distribute that $300 million. Well, the answer to that is dependent on what is the scope of the class that's certified. Let's assume everything goes your way. Sure. There's no ifs. No, I understand. You've got the money. Right. You've got a class. You know exactly every name in the class. Tell me how you're going to distribute the money. Our plaintiff was challenged by way of answer to Your Honor's question. Our plaintiff's standing to bring this claim was challenged because there was an argument that there was no proof that she actually purchased tape. She produced a receipt from Staples which outlined the fact that she purchased 3M tape. The reason for that, Your Honor How much would each member of the class get out of that $300 million? Well, it depends on the quantum. Tell me. Just tell me approximately, your best guess. Well, if the generic was being sold for 40 percent less than the premium, they would get 40 percent of the total purchases. And then if they prove their purchase? Well, if they have receipts, they can prove them. And if you have institutional companies Suppose I bought some Scotch tape. You know, from J.C. Penney or my local drugstore. Yes. And how do I prove that I, to you, that I bought that tape? Well, if you don't have proof, you may not be able to file a claim. But that's a matter of How could anybody remember that they bought Scotch tape at a certain time and a certain place for a certain price? Well, with I'm talking pragmatics. No, I understand. And pragmatically, with respect to the plaintiffs that are before you, they do have receipts. They were part of the record and they were introduced. Institutional clients, like hospitals, like law firms, like government entities, they have purchase orders and receipts as well. Not all the people who purchase are lone individual John Doe purchasers. And the retailers have records as well, because every time you pay with a credit card, those items are itemized in the credit receipt. That's all part of class discovery that we were planning on taking. Getting back to my fifth point of error. What would be the cost of administering the fund? How much percentage would you get to administering the fund? Well, as I understand it, on the Ninth Circuit follows the lodestar approach. And part of the claim under the Recovery Under the Sherman Act that we're entitled to do is the attorney's fees that we've expended. And we would file a petition for attorney's fees upon being a prevailing party, and it would be up to the judge to determine that she could make a reduction or an increase of that lodestar. What do you estimate the percentage would be? I have no idea, Your Honor, because this case was disposed of after three months of discovery. I have no idea how much more effort we'd have to put into it. Okay. Okay. But irrespective of the problem with administering the claims of the class members, before you are only two named plaintiffs. Both of those have receipts to prove their overcharge. And whatever the pragmatics of your argument and the appeal of those pragmatics of your argument may have as to the class, before you is an uncertified class, only two individual plaintiffs. And the question before you is whether they should be allowed to continue with their claims. Now, getting back to my outline, the fifth point of error that we believe the district court committed was that even assuming that everything Judge Wilkins said was correct, that we had to overcome Illinois brick and that the only way we could do so was to invoke a price-fixing exception, we believe she was plainly wrong in finding that there wasn't a questionable question of triable fact as to price-fixing here. Exit Proof Record 999, by way of example, is an e-mail from Jeffrey Peterson, who is a 3M declarant, in which he says, we, Joanne, Steve, and I, met with Staples today to provide them a survey of the retail prices being charged by Kmart, by Wal-Mart, by Sam's, by Costco, all of these detailed price information. And then he says the purpose of it. The purpose is to show our retail accounts that the competitors are taking their prices up. And we showed these communications, including e-mails from Ben Markovich, 3M's account manager for Costco, saying how he got into arguments, in effect, with rival competitors because he was trying to convince them and show to them that the rival competitors were actually adhering to the price-fixing demands put on by 3M and that they should do so as well. Kennedy, about two minutes left, if you want to save anything for rebuttal.  Thank you, Your Honor. Good morning, Your Honors. My name is Larry Popofsky, and I'm counsel for 3M. I'm going to try and save five minutes for Mr. Cooper on behalf of Staples. Let me start at the beginning. During the relevant period of time involved in this case, 3M offered an array of wholesale discounts to its customers if those customers made various volume and products, met various volume and product mix targets. All those discounts were above cost, and 3M believed they were awful. Nonetheless, LePage's, which had started out with something like 9% of the market and moved up to 13, and then, because of this success of this discount program, allegedly fell back to about 9%, claimed it was hurt and that these wholesale discount practices violated Section 2 of the Sherman Act, and the jury so found. That case is on appeal. It's before the U.S. Supreme Court. The Solicitor General's views were asked for six months ago. They've not been tendered yet. And he wasn't ordered to give his views, was he? I'm sorry? He wasn't ordered to give his views. He was given an invitation, and he's never bothered to respond. You're lucky he didn't behave that way in this case. Well, the question is that he will respond, and we expect it daily. But our point is that for present purposes, we can assume that there was a violation of Section 2 of the Sherman Act. It matters not. The critical point is that retailers generally benefited from the wholesale discounts. That, it seems to me, is axiomatic. The target here of any wrongful conduct, if any, was the competitor, LePage's. Plaintiffs, of course, are consumers. And the consumers purchased from the benefited retailers. That means that you agree with your opposing counsel that there's no overcharge to the retailers. Well, certainly on this record, the so-called acts of predation had not matured to such a point that the competitor was knocked out of business and that the wholesale prices then started to rise in the recoupment phase. Obviously, if 3M had knocked LePage's out of business entirely and then was able to start raising wholesale prices and, therefore, hurt retailers, allegedly passing on or not, as the case may be, these consumers still would have no claim. Even if this was a mature, completely mature, monopolization situation, they would have no claim because of Illinois BRIC. They are an indirect purchaser, and under Associated General Counsel, under AGC, they are out of court. So the critical problem that the plaintiffs had in this case from day one was how do you translate lower wholesale prices into higher retail prices? Because it's only if there are higher retail prices that the plaintiffs could be hurt, only if they paid more. And the only way that they could do that is to try to identify an economic mechanism that would accomplish that purpose. Higher wholesale equals – lower wholesale equals higher retail. Now, economically, there is only one way that could happen. Isn't their answer, what they gave us today, that not that they're paying more for the 3M products, but that they are – than they otherwise would, but that they are now having to buy 3M products because the LePage products are not available? That still runs into Illinois BRIC. That still runs into Associated General Counsel. It still runs into their own allegations. LePage is still in the market. It's not gone. They don't allege it's gone. They allege that some customers stopped buying LePages for sure, but one of these plaintiffs bought at Rite Aid stores, which sells today LePages and scotch. Now, it may be that there were some stores that stopped carrying LePages, and some costs to go find LePages because it was less available, but that's not overpriced, and that's not their claim. Their claim is that somehow prices went up. And if you listen to the argument carefully, their argument suggested that what happened was that LePages was a less effective competitor, and as a consequence, the restraints on 3M prices were lucent. And as a consequence, ultimately, 3M prices went up. That is a classic AGC or Illinois brick problem. But let me go back to the core concept at the heart of this case. How do you translate lower wholesale into higher retail? And it can't be simply search costs because of the modest market diminution in market share. The answer has got to be that you have to come up with a mechanism to That is the economic answer. And in order for 3M to control retail margins and ensure retailers that they could have an adequate margin to justify their giving up LePages, giving them an economic incentive to do that act, 3M had to engage in a complicated conspiracy to fix retail prices. That is precisely what the trial judge held. Now, that is a remarkable conspiracy indeed. It's a conspiracy that has to have three elements in it, three. First is that 3M would have to pick a price at which Scotch would be sold at retail. And if that price had to be high enough that it exceeded former prices for both Scotch and for LePages. Second of all, it had to enter into agreements of that character with each and every major retailer in the United States of America. And it had to do that to ensure that anybody who agreed to enter into this agreement, this price fixing agreement, would not be undercut by a competitor. For example, Walmart, Walmart is out there today. Walmart is out there carrying whatever it wants. It can carry LePages, it carries 3M. You have to make sure that Staples, for example, the defendant named here, is part of this arrangement. Because without it, Staples is one of the major retailers. And anybody who could go to Staples and get 3M product Scotch, for example, would be fixed price. So you have to protect the retailer. And then third, you have to have a complicated mechanism to police this nationwide retail price fixing conspiracy. Now, if you can pull off all those things, you now have guaranteed to retailers enough of a margin to justify in their economic terms giving up the competitor's product, LePages. Now, I haven't made this up, this notion of this complicated conspiracy. That is in the amended complaint. It is specifically what is alleged. And the very economic rationale, which I have just outlined for your honors, is the very theory plaintiffs said was operative in order for them to have suffered an economic loss. In short, they elected, as they had to, confronted with Illinois Brick, as they had to, confronted with Associated General Contracts, as they had to, considering the fact that they are not the target of the wrongdoing that LePages supposedly was, the retailers interceded between them and their purchases, they had to come up with this, what I called in the trial court, Rube Goldberg type of conspiracy. They pleaded it. And they pleaded it and couldn't prove it, and it's no surprise. If one just thinks about that remarkable superstructure, trifold conspiracy, you would have to have an enormous track record in documents, for example, to prove it up. You'd have to have a record of prices which were stable in the marketplace. We introduced evidence below that showed prices were all over the place. And that there was complete price diversity at retail, for scotch, for example. The antithesis of price fixing kind of evidence. You would have to have those classic vertical agreements between manufacturers and retailers, which, as Your Honors know, is now so very difficult to establish in the law because of the Monsanto test, the Sharpe test. In fact, you have to have clear evidence that retailers agreed to this price fix. And that's not just one retailer. That's not ten. That is every major retailer in the United States, or the whole scheme falls apart. That's why conspiracies at wholesale would supposedly affect retail prices are so inconceivable, as almost as a matter of law, but so inconceivably difficult to prove or to, you know, administer a class proceeding based on it, that the courts, at least the Federal courts, have shied away from it completely and have adhered to Illinois Berkman Associated General Contractors. Now, this is the case of how many competitors do you have? I'm sorry? In addition to LePage, how many competitors does 3M have? In addition to LePage's, for a period of time, a German company named Tessa manufactured in the United States, and in the record in the Third Circuit proceedings, the evidence was that they gave up because they could not manufacture tape as efficiently in the United States. In addition to that, there were a number, as the record shows with respect to Staples, foreign competitors who import, who would export tape to the United States, and particularly in the private label field, people like Staples or Walgreens or whatever, sourced overseas. Is there any evidence how much that amounts to, the percentage? I'm sorry? Is there any evidence as to the percentage that the competitors have? All we have in the record is that the percentage of 3M for the total market exceeds 90 percent. But for private label, which is the source of the supposedly lower-priced options, LePage's had 88 percent. They had the vast bulk of the private label business. Indeed, the source problem for 3M in all of this was it elected to go into the private label business to compete with LePage's, and it ended up with a Section 2 violation, allegedly, in the East. What I'm really coming to as a final point before I get to the ‑‑ to my confederate to argue, we have a very simple situation. The consumer does not have standing to sue the remote manufacturer. And there was no theory that they could come up with to satisfy that roadblock, save and accept to try and come up with a way to translate the wholesale discounts into retail super profits, the super prices, super competitive prices. The complaint specifically alleges that the plaintiffs were hurt by paying supra competitive prices. What does that mean, supra competitive? Well, that's an interesting question, Your Honor, if I may, because, after all, we start with the fact that 3M has a very large share of the market, and it can charge a price which presumably is affected by competition, but is a price which produces an adequate margin for 3M. Supra competitive can only mean that the price levels before the wrongful acts were deemed lawful, and that, therefore, the only way that supra competitive means that somehow or other price levels have go up, and that they go up as a consequence above what would otherwise be the preexisting competitive level, they go up above above their preexisting level by reason of illegal acts. That's what it means. And here, of course, they've got this economic conundrum which they cannot, they simply cannot get around. So with that, Your Honor, if there are no other questions. Oh, Cartwright. What is the status of the LuPage's lawsuit? The LuPage's lawsuit right now pens in the United States Supreme Court. Awaiting the solicitor general. Awaiting the solicitor general. Obviously, we don't believe that the majority opinion accurately reflected the record. We did have three votes in the court, but not seven, and the victor gets to write history, as I think the expression goes. Was the solicitor general given a period of time in order to respond? It's entirely uncontrolled as to time. There are customs associated with it. I think if the solicitor general does not, in fact, respond shortly, they will be prodded by the Supreme Court. But that is folklore. I do want to say one other thing about the Cartwright Act. It was mentioned there was a Cartwright Act claim. Obviously, the Court has the discretion to dismiss Cartwright Act if Federal Act claims are dismissed. There is a state Cartwright Act claim pending, a class action, in which these plaintiffs are members. They will be included within the defined class, and it's a class action involving both end users, consumers, restaurant in this instance, and intermediate levels of distribution, and presents the very kinds of problems which the Federal courts have said we want no part of in Illinois BRIC. And if you look at the transcript of the record on the Cartwright Act, you'll find that the judge invited the plaintiffs to replead the Cartwright Act claim as a California only claim, and they declined to do so. So I think there is no Cartwright Act issue before you. Thank you, Counsel. Thank you. Good morning, Your Honors. My name is John Cooper, speaking on behalf of Defendants Staples, Incorporated. I'm going to address the question of whether or not there was any evidence of a conspiracy between 3M and Staples to either eliminate LePages or to fix prices. And I have to say, Your Honors, that I believe that this is controlled by your opinion in 1998 in Malarkey v. Holson Bakery and in the Supreme Court's opinion in Monsanto. To focus attention on your opinion in Malarkey v. Holson Bakery, a plaintiff is required to present evidence that tends to exclude the possibility that the manufacturer and non-terminated distributors were acting independently. This means more than showing the distributor acquiesced in the suggested price. It means that the evidence must establish that the distributor communicated its acquiescence or agreement and that the manufacturer sought that. And then you go on to say that the fact that the manufacturer threatened to terminate the distributor if they didn't comply is not evidence of an agreement. It is evidence. It's nothing more than unilateral conduct. And in Monsanto, the Court said the fact that a manufacturer and a distributor are in constant communication about price and marketing strategy does not alone show that the distributors were not making independent pricing decisions. There is no evidence that Staples communicated back to 3M anything relating to price or anything relating to eliminating LePage's. Let me clear up one thing. Counsel for the plaintiff said they're focusing on the generic LePage's private label. Staples never carried LePage's private label tape. They only carried for a period of time LePage's branded tape and they terminated LePage's branded tape prior to the class period and the documents that the plaintiff cites postdate that decision. So it couldn't have been part of that decision. Furthermore, the evidence is, the undisputed evidence is that Staples made an independent decision, this is uncontroverted, that Highland Tape, which is a second-tier tape from 3M, on a per-inch basis was 8.5% below LePage's. The evidence that Mr. Cottrell wanted to cite to, which is the Pedersen email, it talks about 3M, Mr. Pedersen, meeting with Staples to talk about the retail price and provided a retail price survey. There's evidence in the record that that survey consisted of someone from 3M going to different stores and looking at what the prices are on the shelf and then writing  to Staples. If those ads had been in the Chronicle, the Chronicle would have distributed those to everyone available. Hansen v. Shell Oil, Wilcox v. First Interstate Bank, evidence of sharing price surveys of publicly available information is not a plus factor. I'd like to turn briefly to the fact that there's no evidence that there was any agreement communicated from Staples to 3M regarding LePage's in any regard. The evidence is uncontroverted that, that Staples made an independent decision based on price to switch to different brands, different second-tier brands other than LePage's branded, not private label, but branded tape. It's undisputed that Staples carried a private brand tape called Stockwell that was made by Luxus in Taiwan. Staples also, it's undisputed Staples also carried one-touch label tape made by Manco. Both Luxor and Manco were competitors of 3M. And Staples made independent decisions to purchase those tapes from competitors of 3M. Staples, the evidence is uncontroverted that Staples set its prices based upon 66 separate pricing zones within the United States. In those separate pricing zones, there were 1,000 stores in the United States, 175 stores in California. Now, and there's evidence that those, the prices among those stores varied by as much as 12 percent on the same item between Boston and Los Angeles. Now, Mr. Papofsky is absolutely correct that to carry out a conspiracy that complex between thousands of stores would have taken an unbelievable amount of resources, an impossible amount of resources. There's no evidence that any inference could be drawn or any direct evidence was presented that there was an agreement that was communicated from Staples to 3M regarding either price or makeup of products. Thank you. Thank you, counsel. I'd like to start by addressing the last point that was made by Mr. Cooper. You notice that the discussion about the exclusion of LePage's and evidence of exclusion of LePage's was not made by 3M. It was made by Staples. And the reason for that is telling.  LePage has already found that the mechanism by which the en banc panel found that the mechanism by which 3M unlawfully monopolized the market was by entering into bundled rebate agreements with its retailers. And this notion that that doesn't make sense for us, we can't prove it unless we prove a separate price-fixing agreement, overlooks the key factor in those bundled rebate agreements, which was the coercive aspect of it. 3M told its retailers, if you don't go along with us, guess what? Not only will we withhold, not give you the discount on 3M tape, but we won't give you any rebates on other unrelated product lines where we are monopolists. That was the coercive nature of the bundling of the rebates. So it is not correct to say that that conspiracy can't be proven unless we show a separate price-fixing agreement. Is there evidence in the record to that effect? They wouldn't give discounts on other. Your Honor, not only is there evidence in that record, but about a third of the en banc. The only way they could obtain a discount on the bundled items was through the bundled process? That's correct. And that discussion starts in a section aptly named bundled rebates in the en banc opinion, which starts at page 20 of that opinion, page 1226. And I know I'm running out of time. If I could have just two minutes, because I understand that Mr. Cooper went over by one minute or so, just to address this point. Okay. Well, go ahead. We will give you another minute or so. Okay. But I have a question. Sure. To try to wind it up reasonably quickly. Absolutely. Just two points. Synthesizing from what the LePage's opinion actually said, it said, In considering LePage's conduct that led to the jury's ultimate verdict, we note that the jury had before it evidence of the full panoply of 3M's exclusionary conduct, including both the exclusive dealing arrangements and the bundled rebates, which could reasonably have been viewed as effectuating exclusive dealing arrangements because of the way in which they were structured. And they get into how they were structured to withhold that rebate and unrelated product lines. Staples argues that there is no evidence of a communication between Staples and 3M as to any of those conspiracies. But that's simply not what the en banc panel found. One item of evidence that our court, our district court, found not to be evidence was this memorandum of a 1.5 percent bonus, 1 percent bonus being paid. Quoting from the en banc panel, Staples was offered an extra 1 percent bonus rebate if it gave LePage's business to 3M, unquote. That was what the en banc panel found powerful evidence of an agreement between 3M and Staples. Judge Wilkin found that Staples denied that it had received it and therefore disregarded it. But that at least created a tribal question of fact. Thank you. All right. I have a question, please. Is your claim for loss of opportunity to purchase LePage's tape at a lower price or is it that you're paying a higher price because of price fixing or both? As pleaded, it is both. And by that I mean that we pleaded that our injury was paying super competitive or anti-competitive prices. The manner by which we measure the quantum of the damage as opposed to the fact of damage, the quantum of the damage, there's an alternative way to measure it. One way to measure it is the latter of which you've indicated. That is, what would 3M's tape price have been absent the conspiracy? But another perfectly sound measure of the quantum of damage is the difference between 3M price tape and LePage's tape. Because if LePage's tape was not available after the conspiracy, then we've been injured in that manner as well. Now, to the extent that you're alleging super competitive prices, that would involve duplicative damages unless there were a conspiracy, right? Unless there were a conspiracy, though not necessarily a price fixing conspiracy. Obviously, the whole scheme here is that 3M effectuated its monopoly through its retailers. We don't deny that. Our bone of contention is that it doesn't require the setting of a retail price. The co-conspirator exception to Illinois BRIC, whether you deem it an exception or a non-application of Illinois BRIC, is simply not confined to questions of price fixing. One example. Assume that 3M had wanted to destroy LePage's and it went to Staples and other retailers and it said, if you burn down LePage's factory, I'll take care of you. I'll pay you $20 every month for the rest of the year or $20,000 or $20 million. Now, is it reasonable to believe, then, that under Illinois BRIC only the retailers who did the factory burning would have a claim and we as the consumers who were deprived of the lower price LePage's tape would not? Of course not. The reason is that there was a co-conspirator exception would apply there. There is no price fixing. They just destroyed LePage's and that's all we're saying happened here. All right. Thank you, counsel. Thank you, Your Honor. The case just argued will be submitted. Thank you all very much for the argument. All rise. The court will stand and recess for the day. Thank you. Thank you. Hello. Thank you. How are you? Nice to see you. How are you? Nice to see you. See you all later. Good. How are you, man? Nice to see you again. John, good to see you. Good to see you, man. Hope to see you again.  Thank you. Thank you. Nice to meet you. Thank you. Good luck.
judges: Ferguson, Reinhardt, Paez